**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| **CAROL A. WILSON, ADMINISTRATOR OF OHIO OPERATING ENGINEERS HEALTH AND WELFARE PLAN, OHIO OPERATING ENGINEERS PENSION FUND, OHIO OPERATING ENGINEERS APPRENTICESHIP AND TRAINING FUND, AND OHIO OPERATING ENGINEERS EDUCATION AND SAFETY FUND, et al.,** | : : : : : : : : : | **Case No. 2:23-cv-03048**<br>**Judge Algenon L. Marbley**<br>**Magistrate Judge Kimberly A. Jolson** |
| **Plaintiffs,** | : : | |
| **v.** | : : | |
| **DM EXCAVATING, LLC,** | : : | |
| **Defendant.** | : | |

**<u>OPINION AND ORDER</u>**

This matter is before this Court on a Motion for Summary Judgment (ECF No. 15) by Plaintiffs Carol A. Wilson and Trustees of the Ohio Operating Engineers Health and Welfare Plan, the Ohio Operating Engineers Pension Fund, and the Ohio Operating Engineers Apprenticeship and Training Fund (collectively, "Plaintiffs"). Defendant DM Excavating LLC ("DM Excavating") filed a motion for extension of time to file a cross-motion for summary judgment (ECF No. 16) and contemporaneously filed its response and Cross-Motion for Summary Judgment (ECF No. 17). For the reasons set forth below, Plaintiffs' Motion for Summary Judgment (ECF No. 15) is **DENIED** and Defendant's Cross-Motion for Summary Judgment (ECF No. 17) is **DENIED**.

## I.    BACKGROUND

This case arises under the Employee Retirement Income Security Act of 1974 ("ERISA"). Plaintiff Carol Wilson administers the Ohio Operating Engineers Health and Welfare Benefit Plan ("Health Fund"), the Ohio Operating Engineers Pension Fund ("Pension Fund"), and the Ohio Operating Engineers Apprenticeship Fund ("Apprenticeship Fund"). (ECF Nos. 1 ¶ 3; 15 at 3; 17 at 2). Together, the Health Fund, Pension Fund and Apprenticeship Fund are referred to as the "Funds." The Funds are multiemployer benefit funds to which certain employers are obligated to remit timely contributions pursuant to a collective bargaining agreement.  Ms. Wilson, together with the Trustees of the Funds, brought this case against an employer, Defendant DM Excavating, for "DM Excavating's failure to meet its contractual obligation to provide the Funds with contributions reflecting its employees' earned benefits." (ECF No. 15 at 3).

### A.  The Collective Bargaining Agreements

On March 28, 2017, DM Excavating signed a CBA, the "Distribution and Maintenance Agreement," effective June 1, 2013 through May 31, 2017 ("2013 Agreement"). (ECF Nos. 15-2; 15 at 4; 17 at 5; 20 at 1).

The 2013 Agreement  was by and between the Distribution and Maintenance Contractors and the International Union of Operating Engineers, Local Nos. 18, 18A, 18B, 18C, and 18RA (the "Union"). (ECF Nos. 17-2; 20-1). It was made upon the parties' desire "to stabilize employment, establish working hours, provide  equitable wage rates and promote a high level of productivity . . . ." (ECF No. 20-1 at 3). It provided for fringe benefits under a Fringe Benefit Program to be "paid on all hours paid"  and established three benefit categories: Health & Welfare, Pension, and Apprenticeship. (*Id*. at 14, 19). The following contribution rates were set:

| **Fringe Benefits*** | | | |
| 6/1/13 | 6/1/14 | 6/1/15 | 6/1/16 |
| Health & Welfare $6.91 | $7.16 | $7.41 | $7.41 |
| Pension 6.00 | 6.00 | 6.00 | 6.00 |
| Apprenticeship .60 | .67 | .75 | .75 |

*Wages and fringes will be retroactive to June 1, 2013

(*Id*. at 14). If the Union requested to "divert a wage increase" to the Fringe Benefit Program, the Union was required to "give the Employer at least sixty (60) days notice." (*Id*. at 19). Additionally, under the agreement, authorized representatives had the right to audit DM Excavating's records "with respect to the hours worked by and wages paid" and the audit had to "be conducted with the Fringe Benefit Funds and Plan" rather than conducted independently. (*Id*. at 24).

The 2013 Agreement was effective from June 1, 2013, until May 31, 2017, and included an evergreen clause stating the agreement shall remain "in effect from year to year thereafter unless either party shall give written notice to the other party of its desire to renegotiate" the 2013 Agreement. (ECF No. 20-1 at 24). The parties agree that no notice of a desire to renegotiate the agreement was given. (ECF Nos. 20 at 7; 17-1).

Effective June 1, 2017 through May 31, 2021, a subsequent agreement was created between Distribution and Maintenance Employers and the Union. ("2017 Agreement"). (ECF No. 15-1). Like the 2013 Agreement, the 2017 Agreement provided that "Fringe Benefits shall be paid on all hours paid. If the Union requests to divert a wage increase to the Fringe Benefit Program after this Agreement is in effect, the Union shall give the Employer at least sixty (60) days prior notice to allow the change to be made in the certified prevailing rates." (*Id*. at 18). The 2017 Agreement, however, established new contribution rates for fringe benefits:

|  | **Fringe Benefits*** | | | |
|---|---|---|---|---|
|  | 6/1/17 | 6/1/18 | 6/1/19 | 6/1/20 |
| Health & Welfare | $8.01 | $8.01 | $8.01 | $8.01 |
| Pension | 6.00 | 6.00 | 6.00 | 6.00 |
| Apprenticeship | .75 | .80 | .85 | .85 |

*Wages and fringes will be retroactive to June 1, 2017

(*Id*. at 13).

The 2017 Agreement, however, was not signed by DM Excavating. DM Excavating provided a declaration from its President and owner, David McElrath, who handles the management, administration, union relations, and employee relations. (ECF Nos. 17 at 4; 17-1). He represents he has never seen the 2017 Agreement and was never notified of it. (ECF No. 17-1).  Plaintiffs, on the other hand, provided three Fringe Benefit Contribution Reporting Forms signed by McElrath. (ECF No. 20-2). Two of the forms were for the March 2017 reporting period and incorporates the 2013 Agreement contribution rates. (*Id*. at 1-2). One form is for the April 2020 reporting period and uses the 2017 Agreement contribution rates. (*Id*. at 3).

### B.  Prior Litigation

In December of 2018, Plaintiffs filed a complaint against DM Excavating and sought enforcement of their audit rights under the 2013 Agreement in order to discern information to "obtain delinquent contributions, interest on the delinquent contributions, late fees for the delinquent contributions, the cost of collecting the delinquent contributions, including attorney fees, and injunctive relief." *Wilson v. DM Excavating*, LLC, 844 F. App'x 827, 829 (6th Cir. 2021). The district court required DM Excavating to comply with the audit requirement, which was subsequently completed for the period of March 1, 2017, to June 1, 2019. *Wilson v. DM Excavating, LLC*, No. 2:18-CV-1779, 2020 WL 247374, at *1 (S.D. Ohio Jan. 16, 2020), *aff'd*,

844 F. App'x 827. The auditor found that DM Excavating owed delinquent contributions, interest, and late charges. *Wilson*, 844 F. App'x at 830.

Plaintiffs moved for summary judgment upon the auditor's finding and the district court granted Plaintiffs' motion. DM Excavating appealed, arguing that it was not required to make contributions based on all hours worked by its employees at any location, and if it was required, the hours paid should be offset by the amount it paid to the International Union of Operating Engineers, Local #66, ("Local 66"). *Id*.

On appeal, the Sixth Circuit applied *Bunn Enterprises, Inc. v. Ohio Operating Engineers Fringe Benefit Programs*, 606 F. App'x 798 (6th Cir. 2015) in deciding in favor of the plaintiffs. In *Bunn*, the court found similar "all hours paid" language required "employer signatories to contribute the appropriate benefits contributions for all hours worked by their employees, regardless of whether those hours are 'covered' under the contract." *Wilson*, 844 F. App'x at 831 (quoting *Bunn Enterprises*, 606 F. App'x at 804). The court in *Wilson* then found that it did not need to decide whether the 2013 Agreement required "DM Excavating to pay fringe benefit contributions for all work performed by its employees regardless of the geographic location of the employees' work, because DM Excavating has not met its burden to keep adequate records of where the work was performed." *Id*. at 832. Instead, the court applied a burden-shifting framework under which, "once the funds produce evidence that the employer is not making contributions to the funds as required by its CBA, the burden shifts to the employer to produce records showing that the work performed was not within the union's craft jurisdiction." *Id*. The court found DM Excavating failed to meet its burden as it "did not produce any records that identified the location of the work performed by its employees."

The Sixth Circuit, thus, affirmed the district court's decision and found DM Excavating was required to pay the fringe benefit contributions, interest, and liquidated damages as calculated by the district court. *Id*. at 832–34.

### C.  Procedural Background

In July 2023, Plaintiffs completed an audit of DM Excavating's payroll records for the time period between June 2019 and April 2020. (ECF Nos. 15-6; 15-7). The audit report indicated that DM Excavating owed $72,611.13 to the Funds. (ECF No. 15-7). Plaintiffs requested payment of the amounts owed but DM Excavating failed to pay. (ECF Nos. 15 at 4; 15-6).

On September 22, 2023, Plaintiffs filed their six count Complaint against DM Excavating. Count I is for contributions to the Health and Welfare Fund, Count II is for contributions to the Pension Fund, Count III is for contributions to the Apprenticeship Fund, Count IV is for all interest owed, Count V is for statutory interest, and Count VI is for costs and fees. (ECF No. 1). DM Excavating filed its Answer on December 14, 2023. (ECF No. 11). In its Answer, Defendant denied Plaintiffs' allegation that DM Excavating executed agreements under which it was required to make timely payments to the Funds due to "lack of knowledge and lack of possession of relevant documents and information to permit it to admit or deny such allegations." (*Id*. ¶¶ 6, 11, 16). It did, however, detail an agreement it has with Local 66. (*Id*.).

The preliminary pretrial order was entered, setting a July 19, 2024, deadline for dispositive motions. (ECF No. 13). On July 19, 2024, Plaintiffs filed a motion for summary judgment. (ECF No. 15). On August 7, 2024, DM Excavating responded with a motion for extension of time to file a cross-motion for summary judgment and contemporaneously filed its response to Plaintiffs' motion along with its cross-motion for summary judgment. (ECF Nos. 16, 17). Plaintiffs filed a reply in support of their motion for summary judgment and argued the cross-motion should not be

6

allowed to proceed because it was untimely. (ECF No. 20). DM Excavating subsequently filed a reply in support of their cross-motion for summary judgment noting that it "deals only with the issues and facts presented by DM in connection with its Cross-Motion for Summary Judgment and is not a Sur-Reply on the other issues" presented by Plaintiffs. (ECF No. 23 at 3). Plaintiffs filed a motion to strike DM Excavating's reply. (ECF No. 24).

## II. STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Berryman v. SuperValu Holdings, Inc.*, 669 F.3d 714, 716–17 (6th Cir. 2012). The Court's role is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249. Evidence that is "merely colorable" or "not significantly probative" will not defeat summary judgment. *Id*. at 249–50.

The party seeking summary judgment has the initial burden of presenting the Court with law and argument in support of its motion, as well as "identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). "If the moving party satisfies its burden, then the burden of going forward shifts to the nonmoving party to produce evidence that results in a conflict of material fact to be resolved by a jury." *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995).

In considering the factual allegations and evidence presented in a motion for summary judgment, the Court "views factual evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor." *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 511 (6th Cir. 2009). Even so, "[t]he mere existence of a scintilla of evidence to support [the nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995); *see also Anderson*, 477 U.S. at 251.

### III. LAW AND ANALYSIS

#### A. Motion to Strike

Prior to reaching the substantive arguments raised in the motions for summary judgment, this Court will first address Plaintiffs' request that this Court not consider DM Excavating's cross-motion for summary judgment. *See Brainard v. American Skandia Life Assur. Corp.*, 432 F.3d 655, 657 (6th Cir. 2005). The Preliminary Pretrial Order entered in this case ordered any dispositive motions to be filed by July 19, 2024. (ECF No. 13). Plaintiffs filed its motion on July 19, 2024, but DM Excavating did not file its motions for extension of time to file a dispositive motion, or its cross-motion for summary judgment, until August 7, 2024, sixteen days after the deadline. (ECF Nos. 15, 16). In its motion for extension of time to file a cross-motion for summary judgment, DM Excavating explains that its analysis regarding Plaintiffs' claims was incomplete at the time, but it saw for the first time that Plaintiffs' motion for summary judgment relied on an unsigned 2017 Agreement and a signature page for the 2013 Agreement. As such, DM Excavating requests this Court consider its cross-motion for summary judgment in response to this newly discovered agreement.

Modification of the case schedule requires a showing of good cause under Federal Rules of Civil Procedure 16(b)(4). The "primary measure" of "good cause" under Rule 16(b)(4) is

diligence in meeting the deadline. *Ross v. Am. Red Cross*, No. 2:09-CV-905, 2012 WL 367963, at *2 (S.D. Ohio Feb. 3, 2012), aff'd, 567 F. App'x 296 (6th Cir. 2014). Plaintiffs argue that DM Excavating received the 2017 Agreement in initial disclosures and "[f]ailing to review initial disclosures and conclusory assertions that an 'analysis' was incomplete, without explanation, do not demonstrate Defendant's diligence in attempting to meet the July 19 deadline." (ECF No. 20). DM Excavating, however, has provided an explanation: Plaintiffs' intent to enforce an unsigned agreement with a signature for a different agreement was newly discovered information. (ECF No. 23 at 19-20). Indeed, Plaintiffs did not explicitly reference the 2017 Agreement in its Complaint, but it provided the signature page for the 2013 Agreement. (*Id*. at 19; ECF No. 2-1). While Plaintiffs highlight the fact that the 2017 Agreement was provided in initial disclosures, what is relevant for DM Excavating's argument is the signature page. DM Excavating argues that "Plaintiffs have never submitted to DM any document that purports to show that DM signed a 2017-2021 Agreement, or any subsequent agreement." (ECF No. 25). While the cross-motion for summary judgment was filed sixteen days after the deadline for dispositive motions, this was a diligent response to the "falsehoods" alleged by DM excavating. Moreover, DM Excavating requests consolidation of its cross-motion for summary judgment with its response to Plaintiffs' motion. DM Excavating then filed its response to Plaintiffs' motion for summary judgment ahead of its deadline, supporting a finding of diligence by DM Excavating.

Accordingly, DM Excavating's motion for extension of time to file the cross-motion for summary judgment and request to consolidate its with its response to Plaintiffs' motion for summary judgment (ECF No. 16) are **GRANTED**. Plaintiffs' motion to strike (ECF No. 24) is **DENIED**.  This Court will consider DM Excavating's cross-motion for summary judgment.

### B.  Motions for Summary Judgment

Plaintiffs argue it is entitled to Summary Judgment on all counts of their complaint as DM Excavating signed a CBA, and was required to make fringe fund contributions on behalf of its employees on all hours paid but failed to do so. Courts have already considered the specific language of payment of fringe benefits on "all hours paid" and found that it "unambiguously requires employer signatories to contribute the appropriate benefits contributions for all hours worked by their employees, regardless of whether those hours are 'covered' under the contract." *Bunn*, 606 F. App'x at 804; *Wilson v. Bridge Overlay Sys., Inc*., 129 F. Supp. 3d 560, 568 (S.D. Ohio 2015) (employer was required to make contribution on behalf of employee for all hours worked, including hours worked on a machine not identified in the CBA as covered labor).

DM Excavating opposes Plaintiffs' motion and filed a cross-motion arguing that there is no valid agreement. Even if there is a valid agreement, DM Excavating argues the agreement fails to provide for the payment to trust funds as a matter of law. Alternatively, DM Excavating asserts that any amounts owed should consider certain "zones" and "groups" rather than "all hours paid." (ECF No. 17).  Plaintiff filed a reply in opposition to each argument and begins by asserting that DM Excavating is collaterally estopped based on *Wilson*. (ECF No. 20).

### 1.  Whether Claim Preclusion Applies

The 2018 litigation in *Wilson* is demonstrably similar to the case *sub judice*.  In *Wilson* the district court and Sixth Circuit examined the 2013 Agreement after Plaintiffs conducted an audit pursuant to the agreement and discovered that DM Excavating owed delinquent contributions, interest, and late charges under the 2013 Agreement. *Wilson*, 844 F. App'x at 830. DM Excavating raised familiar arguments, specifically regarding: (1) whether it was required to make contributions for all hours paid; and (2) whether the contributions owed should be offset by the amount paid to

10

Local 66. *Id*. Plaintiffs urge this Court to apply claim preclusion to prevent relitigation of the same underlying issues. (ECF No. 20 at 3).

Claim preclusion, or the principle of *res judicata*, is appropriate where there is: "(1) a final decision on the merits by a court of competent jurisdiction; (2) a subsequent action between the same parties or their privies; (3) an issue in the subsequent action which was litigated or which should have been litigated in the prior action; and (4) an identity of the causes of action, satisfied where 'the claims arose out of the same transaction or series of transactions, or if the claims arose out of the same core of operative facts.'" *Trustees of Operating Engineers Local 324 Pension Fund v. Bourdow Contracting, Inc.*, 919 F.3d 368, 380-383 (6th Cir. 2019) (quoting *Browning v. Levy*, 283 F.3d 761, 771 (6th Cir. 2002)). An identity of the causes of action exists if there is an identity of "the facts creating the right of action and of the evidence necessary to sustain each action," *Sanders Confectionery Prods., Inc. v. Heller Financial, Inc.*, 973 F.2d 474, 484 (6th Cir. 1992). To determine the evidence necessary, courts should examine "whether the same underlying factual evidence could support and establish both [claims]." *Heike v. Cent. Mich. Univ. Bd. of Trs.*, 573 F. App'x 476, 483 (6th Cir. 2014). As such, "the critical consideration is operative 'factual overlap' between the claims." *Bourdow Contracting, Inc*., 919 F.3d 368, 383–84 (6th Cir. 2019) (quoting *Heike*, 573 F. App'x at 483).

Here, Plaintiffs seek to invoke claim preclusion offensively despite it being a defensive doctrine that bars a party from asserting claims that were brought or could have been brought in a previous case. *Rivet v. Regions Bank of Louisiana*, 522 U.S. 470, 476 (1998). Generally, "[u]nder the doctrine of *res judicata*, a judgment on the merits in a prior suit bars a second suit involving the same parties or their privies based on the same cause of action." *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 326 n. 5 (1979). It follows that "[u]nder *res judiciata*, a final judgment on

the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Allen v. McCurry*, 449 U.S. 90, 94 (1980).

Nonetheless, the arguments in the case *sub judice* and *Wilson* do not arise out of the same transaction or series of transactions or the same core of operative facts. Rather than seeking to enforce the same 2013 Agreement at issue in *Wilson*, Plaintiffs seek to enforce the 2017 Agreement. While the agreements are nearly identical, they are nevertheless two separate agreements covering different effective dates and detailing different contribution rates. Further, the audit from which Plaintiffs claims arise cover a separate audit period in the case *sub judice*. In *Wilson*, the Sixth Circuit made clear that its decision was based, in part, on the records provided for the audit period. Those records demonstrated DM Excavating's inability to "meet its burden to keep adequate records of where the work was performed." *Wilson, LLC*, 844 F. App'x at 832.

Relevant here is a separate agreement coupled with circumstances not considered by the district court or Sixth Circuit in *Wilson*. Claim preclusion does not apply here based on the new agreement and DM Excavating's argument that it was never a party to the agreement as evidenced by the lack of signature thereto. *See, e.g.*, *Midwest Operating Eng'rs Welfare Fund v. Allied Stone*, 175 F. Supp. 3d 945, 948–49 (N.D. Ill.), *aff'd sub nom. Midwest Operating Eng'rs Welfare Fund v. Cleveland Quarry*, 844 F.3d 627 (7th Cir. 2016) (finding claim preclusion did not apply to a nearly identical collective bargaining agreement because it was nonetheless a separate agreement covering different employees and arising at different times).

### 2. Whether A Valid CBA Exists

Due to the lack of signed agreement, the threshold issue for this Court to consider is whether a valid collective bargaining agreement exists. Plaintiffs maintain that this case is rather straight-forward as it involves "an employer who signed a CBA, failed to perform in accordance

with the CBA, and now must be ordered to remedy the failures of that breach by paying the contributions owed to the Funds." (ECF No. 15 at 4). This is misleading as the only undisputed and signed CBA is the 2013 Agreement, not the 2017 Agreement Plaintiffs seek to enforce. (ECF No. 15-2). DM Excavating's position is that summary judgment must be granted in its favor because the 2013 Agreement expired in 2017, as it was unilaterally restated by the unsigned 2017 Agreement. (ECF No. 17 at 10). Plaintiffs argue that the 2013 Agreement is still effective pursuant to an evergreen clause; and that DM Excavating has assented to the terms of the 2017 Agreement.

### a. The Evergreen Clause and the 2013 Agreement

The 2013 Agreement is a signed agreement with an evergreen clause providing that the agreement remains effective from June 1, 2013 until May 31, 2017, and "from year to year thereafter unless either party shall give written notice to the other party of its desire to renegotiate" the 2013 Agreement. (ECF No. 20-1 at 24). When a contract is renewed by an evergreen clause, all of the attendant contractual obligations naturally continue for the period of renewal. *Trs. of B.A.C. Loc. 32 Ins. Fund v. Fantin Enters., Inc*., 163 F.3d 965, 968–69 (6th Cir. 1998). In the context of evergreen clauses, if a defendant argues a CBA was terminated and thus the defendant has no obligations, the defendant must show a party "unequivocally communicated its intent to withdraw from the CBA." *Orrand v. Scassa Asphalt, Inc.*, 794 F.3d 556, 564–65 (6th Cir. 2015). Moreover, when "clear and specific language in a labor agreement is at issue, federal courts are uniform in their strict interpretation of such language." *Irwin v. Carpenters Health and Welfare Trust Fund For California,* 745 F.2d 553, 556 (9th Cir.1984).

It is undisputed that neither party provided notice of a desire to renegotiate as required under the evergreen clause of the 2013 Agreement. (ECF Nos. 17-1 at 2; 20 at 5). The 2013 Agreement clearly and unambiguously requires renewal of the agreement unless parties provide a

written notice of the desire to renegotiate. Without this notice, the 2013 Agreement remains effective.

While relying on the ordinary principles of contract law, DM Excavating asserts that the notice requirement in the evergreen clause was waived because the 2013 Agreement was substituted by the unsigned 2017 Agreement. (ECF No. 23 at 8). Indeed, a review of collective bargaining agreements require an application of "ordinary principles of contract law." *Tackett v. M & G Polymers USA, LLC*, 811 F.3d 204, 208 (6th Cir. 2016) (quoting *M & G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 435 (2015)). DM Excavating analyzes the intent of the parties and plain meaning of the agreement; the customs and usage; the entirety of the agreement; and the creation of a lifetime promise. (*Id*. at 9-10). It fails, however, to overcome the plain language in the 2013 Agreement requiring "written notice to the other party of its desire to renegotiate." DM Excavating fails to identify any authority or language in the 2013 or 2017 Agreement suggesting that the clear and unambiguous notice requirements of the evergreen clause are waived by the creation of a new agreement to which DM Excavating asserts it is not a party.

Generally, a new agreement alone, despite the nearly identical terms, will not waive the notice requirement in the evergreen clause of a CBA. For example, in *Fantin*, the Sixth Circuit found the collective bargaining agreement remained in effect due to its valid evergreen clause despite the existence of a subsequent agreement. 163 F.3d at 968–69. The defendant signed a 1991 collective bargaining agreement which included an obligation to pay contributions to the union and in 1992, the union entered into a similar collective bargaining agreement to which the defendant was not a signatory or a party. *Id*. The defendant argued that the existence of the later contract constituted written notice of intent to terminate or modify the 1991 agreement. The court noted that, unless ambiguous, a collective bargaining agreement is limited to the language

14

contained in its four corners. *Id*. at 969. The termination clause in the 1991 agreement provided clear, unambiguous terms upon which the contract could be canceled through written notice by either party of their intent to terminate it. *Id*. Neither agreement had language suggesting that the existence of a later contract could act as the written termination of the 1991 Agreement. Moreover, the court found that there is no authority to support the proposition that a later agreement will act as a notice of termination to an earlier contract entered into by that entity. *Id*.

Like in *Fantin*, DM Excavating signed a collective bargaining agreement which included an obligation to pay contributions and in 2017, a new agreement was entered into by the Union to which the defendant was not a signatory. The evergreen clause in the 2013 Agreement is clear and unambiguous in requiring renewal unless either party gives written notice to the other party of its desire to renegotiate the agreement. Nothing in the 2013 or 2017 Agreement suggests that the 2013 Agreement terminates upon creation of a subsequent agreement. As such, the 2013 Agreement remains in effect.

Even though this Court finds the 2013 Agreement remains in effect pursuant to the evergreen clause, this alone is not enough to enforce the amounts Plaintiffs assert are owed. As Plaintiffs admit, the 2013 Agreement and 2017 Agreement are different in that the 2017 Agreement includes "slight wage and fringe benefit fund contribution increases." (ECF No. 20 at 5). Based on the audit report, Plaintiffs seek to enforce these increased rates. (ECF No. 15-7). Under the 2013 Agreement, "[i]f the Union requests to divert a wage increase to the Fringe Benefit Program after this Agreement is in effect, the Union shall give the Employer at least sixty (60) days prior notice to allow the change to be made in the certified prevailing rates." (ECF No. 20-1 at 18). Plaintiffs have not evidenced such notice was provided, nor have Plaintiffs argued this requirement was met. Instead, Plaintiffs argue that the 2013 Agreement remains in effect and the relevant terms are

identical in the 2017 Agreement, aside from increases in fringe benefit contributions. Plaintiffs also assert that DM Excavating has not disputed the rates and has contributed at the rates required. As such, Plaintiffs argue DM Excavating assented to and is bound by the 2017 Agreement. (ECF No. 20 at 3).

### b. Assent and the 2017 Agreement

Plaintiffs argue the 2017 Agreement terms apply and assert entitlement to summary judgment on their claims based on the manifestation of assent to the 2017 Agreement during the audit period.

In its cross-motion for summary judgment, DM Excavating asserts that it is entitled to summary judgment because it is not bound by the unsigned 2017 Agreement. (ECF No. 17 at 10–13). DM Excavating first supports its assertion by relying on section 302 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. §186. Section 302(a) of the LMRA prohibits an employer from contributing funds to various employee representatives and is subject to certain exceptions. One such exception is for payments made "to and from a trust fund for the benefit of employees" provided "that such payments must be made in accordance with a written agreement with the employer. *Cent. States, Se. & Sw. Areas Pension Fund v. Behnke, Inc*., 883 F.2d 454, 459 (6th Cir. 1989) (citing 29 U.S.C. § 186(c)(5)(B)). Rather than arguing there is no "written agreement," as required under the LMRA, DM Excavating takes the LMRA requirement a step further by arguing that the written agreement provided does not include a signature. Agreement. (ECF No. 17 at 12).

The Sixth Circuit has held that "the employer does not have to sign the written agreement to be bound by it" because the LMRA "does not specify any signature requirement." *Bd. of Trustees of the Plumbers, Pipe Fitters, Loc. Union No. 392 Pension Fund v. B & B Mech. Servs., Inc*., 813 F.3d 603, 609 (6th Cir. 2015). The cases DM Excavating reference do not reach a contrary

16

conclusion. For example, DM Excavating relies on *Merrimen v. Paul F. Rost Electric, Inc.*, 861 F.2d 135 (6th Cir. 1988), which involved a collective bargaining agreement that explicitly required that firms agreeing to its terms sign a separate Letter of Assent. *Id.* at 136. The defendant did not sign such a letter, but the plaintiffs argued that its actions nonetheless bound it to the terms of the agreement. The court rejected this argument, citing 29 U.S.C. § 186's requirement for a written agreement obligating payments to employee groups. *Id.* at 139. *Merrimen* is not applicable here, however, because the case *sub judice* involves a writing—the 2013 and 2017 Agreements—and DM Excavating cites no support that would make this writing inconsequential.

Similarly,  DM Excavating references *Moglia v. Geoghegan*, 403 F.2d 110 (2d Cir. 1968), *cert. denied*, 394 U.S. 919 (1969). In *Moglia*, the Second Circuit found the LMRA written agreement requirement under section 302(c)(5)(B) was not met by an unsigned collective bargaining agreement.  403 F.2d at 118. The plaintiff argued that the employer's conduct aligned with terms of the collective bargaining agreement. This conduct included paying uniform union scale wages and by making contributions to the trust fund. The plaintiffs sought enforcement of the unsigned agreement because the defendant's conduct demonstrated ratification and adoption of a written agreement despite the agreement being unsigned. *Id.*

To DM Excavating's point, the parties in *Moglia* did not have a signed agreement and the court found proof of a written but unsigned agreement and the parties' conduct was insufficient to satisfy section 302(c)(5)(B). *Id*. The court, however, did not hold that a signed agreement was required; rather, it noted that ratification and adoption are forms of acceptance of a contract requiring mutuality of agreement and mutuality of obligation. *Id*. The relevant trust agreement allowed parties to sign while in the process of negotiating or executing a complete collective bargaining agreement, but ultimately required a signed collective bargaining agreement for

17

participation in the fund. *Id.* at n.6.  The court found that the employer did not appear to be willing to accept the terms of the collective bargaining agreement at any time, thus, "it would be ridiculous to assert that there was agreement between the parties and a mutuality of obligation. Therefore, on the record as made, we hold that there was no ratification of, or any adoption of, the collective bargaining agreement by" the defendant. *Id*.

Whether the terms of the 2017 Agreement that was not signed by DM Excavating can be enforced against it, thus, turns on whether DM Excavating assented to the agreement. It is "well established that a collective bargaining agreement is not dependent on the reduction to writing of the parties' intention to be bound; rather, all that is required is conduct manifesting an intent to abide and be bound by the terms of the agreement." *Salisbury v. Kroyer Heating & Air Conditioning, Inc.,* 844 F.2d 789, *3 (6th Cir.1988) (Table) (citations omitted); *see also Mich. Bricklayers and Allied Craftsmen Health Care Fund v. Northwestern Constr., Inc.,* 116 F.3d 1480, *2 (6th Cir.1997) (Table); *Trs. of the Flint Mich. Laborers' Pension Fund v. In–Puls Constr. Co.,* 835 F.Supp. 972, 973 (E.D.Mich.1993); *Advance Cast Stone Co. v. Bridge, Structural and Reinforcing Iron Workers, Local Union No.1,* 376 F.3d 734, 737 n. 2 (7th Cir.2004).

Certain actions may bind a party as a form of implied acceptance, even where a signed document has expired. *Ohio & Vicinity Reg'l Council of Carpenters v. Greg Constr. Co.*, 433 F. Supp. 2d 862, 866 (N.D. Ohio 2006). Examples of conduct relevant under this "implied acceptance" theory include: 1) sending CBA required payroll reports; 2) paying union fringe benefit contributions on behalf of employees; 3) requesting employees from the union under CBA procedures; 4) forwarding union dues withheld from paychecks; 5) cooperation with CBA mandated audits; and 6) paying union scale wages. *Id.* (citing *Salisbury.,* 844 F.2d 789, *2).

18

Here, Plaintiffs argue that during the term of the 2017 CBA, DM Excavating completed one Fringe Benefit Contribution Reporting Form, signed by McElrath, reflecting the rates of the 2017 CBA and DM Excavating submitted Local 18 Administrative Dues. (ECF No. 20 at 6). Plaintiffs also assert that DM Excavating admitted its obligation in the Parties' Rule 26(f) Report. (*Id*.). Further, in *Wilson*, the district court entered an order requiring that DM Excavating comply with the Plaintiffs' request for documents so as to complete a payroll audit, whereupon DM Excavating provided its payroll records. *Wilson*, 844 F. App'x at 829.[1] Plaintiffs argue these actions demonstrate assenting to, being ordered to comply with, and admitting to the obligations under the 2017 Agreement. (ECF No. 20 at 6).

Based on the facts presented, it is unclear whether DM Excavating assented to the 2017 Agreement. DM Excavating responds that the one Fringe Benefit Contribution Reporting Form it completed reflecting the rates of the 2017 CBA is insufficient. With respect to the alleged admission in the 26(f) Report, DM Excavating argues it "believed that the 2013 Agreement was still in effect. DM had no idea that Local 18 had unilaterally substituted the 2017-2021 Agreement for the 2013 Agreement." (ECF No. 23 at 7). Indeed, the majority of Plaintiffs' argument relies on enforcement of the 2017 Agreement contribution rates. Plaintiffs submitted the Fringe Benefit Contribution Reporting Forms signed by McElrath, two of which were for the March 2017 reporting period and includes the 2013 Agreement contribution rates. (ECF No. 20-2 at 1–2). Only

---

[1] In *Wilson*, Plaintiffs sought enforcement of the 2013 Agreement. The court granted Plaintiffs' motion for summary judgment and required the payment calculated pursuant to Plaintiffs' audit report. Based on the audit report provided in *Wilson*, the audit was for the period of March 1, 2017, to June 1, 2019, and calculated some contributions rates based on the 2017 Agreement. *See Wilson et al v. DM Excavating, LLC*, 2:18-cv-1779, ECF No. 20-2. The parties, however, did not dispute that DM Excavating was party to the CBA during the audit period of March 1, 2017 to June 1, 2019. The parties also did not dispute whether it was obligated to pay contribution rates under any agreement. Rather, "[t]he dispute concern[ed] whether delinquent contributions were properly assessed during the audit period against three specific employees: David McElrath, Brad Doan, and Joel McElrath." *Wilson*, 2020 WL 247374, at *2. The case *sub judice*, on the other hand, raises the issue of the applicability of the 2013 Agreement or the 2017 Agreement which include different contribution rates each of which DM Excavating disputes it owes.

one form—which represented the April 2020 reporting period—uses the 2017 Agreement contribution rates. (*Id*. at 3). Additionally, the 26(f) Report does not explicitly reference a 2017 Agreement, nor does the *Wilson* decision.

While unclear whether DM Excavating assented to the 2017 Agreement, this Court does not find that DM Excavating's alleged lack of knowledge of the 2017 Agreement entitles it to summary judgment. In response to Plaintiffs' argument of implied acceptance, DM Excavating emphasizes that it was unaware of the unilaterally implemented unsigned 2017 Agreement. It relies on *Greg Constr. Co.*, where the court found that a "party may not rely on its own conduct that a plaintiff had no reason to know of to undermine its implied acceptance of the contract." 433 F. Supp 2d at 866. In *Greg Constr. Co.*, the court noted the parties had a CBA and a participation agreement. The CBA included an evergreen provision automatically renewing itself with successive iterations unless either party repudiated the CBA at one of its expirations. *Id*. at 864. The relevant participation agreement expired but the defendant continued paying CBA wages, contributing to the unions' benefit funds, filing CBA mandated payroll reports, and requesting employees from the unions under CBA prescribed guidelines on a number of projects. *Id*. at 866. The issue before the court was whether the defendant remained bound to successive CBAs when it did not provide timely notice of repudiation as prior agreements expired. *Id*. at 865. The court recognized that, under controlling law, the conduct suggested implied acceptance and an intention to be bound. *Id*. at 866. The court, however, found that the defendant acted inconsistently with the terms of the CBA but there remained a genuine issue of material fact whether the unions knew or should have known of that behavior. *Id*.

Here, DM Excavating does not argue the expression of any conduct suggesting termination of the CBA, which was the primary conduct at issue in *Greg Constr. Co*. Even so, if this Court

applies the logic of *Greg Constr. Co.*, DM Excavating's emphasis on its lack of awareness of the 2017 Agreement is a futile argument. It is significant that "the 2013 Agreement is still in effect, and all the terms germane to this matter are identical in the 2017 Agreement, aside from slight wage and fringe benefit fund contribution increases." (ECF No. 20 at 7). The slight difference in wage in fringe benefits, however, is accounted for by the 2013 and 2017 Agreements identical provisions indicating that if "a wage increase" is diverted to "the Fringe Benefit Program," the union shall provide 60 days' notice and then the contribution increase will be effective. (ECF No. 20-1 at 19; ECF No. 15-1 at 18). As such, the lack of knowledge of the 2017 Agreement, alone, does not necessitate a finding that DM Excavating did not assent to the terms of the 2017 Agreement.

Accordingly, the 2013 Agreement remains in effect and lack of knowledge of the successor 2017 Agreement, alone, is insufficient for finding DM Excavating is not bound by its terms. As Plaintiffs do not seek to enforce the contribution rates in the 2013 Agreement, there remains a genuine issue of material fact as to whether DM Excavating assented to the 2017 Agreement or was notified of the wage increases Plaintiffs seek to enforce. As explained above, Plaintiffs only provided one Fringe Benefit Contribution Reporting Form implementing some increased rates they seek to enforce here. This is insufficient to demonstrate that DM Excavating assented to the 2017 Agreement, or that DM Excavating was notified of wage increases as required to enforce the 2017 Agreement contribution rates under the 2013 Agreement that remains in effect.

### 3. Whether the Agreement Sufficiently Identifies Plaintiffs

In its motion, DM Excavating also argues that the LMRA Section 302(c)(5) is clear that express written terms are required in order to permit contributions to be paid to a trust. DM Excavating asserts that the 2017 Agreement does not specifically identify or name the Plaintiff

Health Fund, Pension Fund or Apprenticeship Fund. Therefore, even if the 2017 Agreement applied, it does not identify the recipient trust, as required by the LMRA. (ECF No. 17 at 13; 23 at 15).

The first page of the agreement lists both the International Union of Operating Engineers, Local 18, and the "Ohio Operating Engineers Fringe Benefit Programs." (ECF No. 20-1). The Agreement then references under Article XII: Fringe Benefit Programs the "Ohio Operating Engineers Fringe Benefit Programs" and in a prior section listed the "Fringe Benefits" as "Health & Welfare," "Pension," and "Apprenticeship." (*Id*. at 14). This corresponds with the names of the Local 18 Funds. Moreover, as Plaintiffs explain, "Defendant points to no authority requiring that fringe benefit funds be referred to with formalistic or exacting language within a CBA." (ECF No. 20 at 14).

DM Excavating, thus, is not entitled to summary judgment on this basis.

### 4. Whether DM Excavating Owes Contributions on "all hours paid"

In the alternative, DM Excavating argues the amount owed must be calculated differently. It attempts to argue the "all hours paid" language in the applicable CBA is "tied" to the wage provisions and thus, must consider the jurisdiction of the work performed. (ECF No. 17 at 16). In *Wilson*, DM Excavating raised the same argument with respect to the 2013 Agreement and asserted that the amounts owed should offset the contribution by the amount it paid to Local 66. DM Excavating submitted affidavits alleging employees performed work outside the union's geographic jurisdiction, along with two cancelled checks allegedly made to fringe benefit funds affiliated with Local Union 66. *Id*. at 834. The court held:

> We need not decide whether the CBA in the present case requires DM Excavating to pay fringe benefit contributions for all work performed by its employees regardless of the geographic location of the employees' work, because DM

Excavating has not met its burden to keep adequate records of where the work was performed.

*Wilson*, 844 F. App'x at 832. The Sixth Circuit determined that the "late produced evidence [did] not satisfy DM Excavating's burden to show the hours that [the employees] allegedly worked outside the geographic jurisdiction covered by the CBA." *Id.*

The present situation is entirely the same: Defendants have only submitted affidavits alleging hours worked outside of the jurisdiction covered by the 2013 and 2017 Agreements. Despite submitting similar evidence to support its argument that "all hours paid" should be interpreted differently, DM Excavating fails to address the inadequacies in record keeping found by the Sixth Circuit in *Wilson* and fails to suggest why the evidence submitted is any different.

As such, DM Excavating is not entitled to summary judgment in its favor on the meaning of "all hours paid."

\*　　\*　　\*　　\*　　\*

This Court: (1) finds that DM Excavating has obligations under the 2013 Agreement; (2) rejects DM Excavating's arguments that the agreements fail to meet the requirements of LMRA Section 302(c)(5); and (3) finds that DM Excavating failed to meet its burden to show adequate records were maintained with respect to its argument for calculations of "all hours paid." Plaintiffs, however, seek enforcement of the terms of the 2017 Agreement which includes higher contribution rates than agreed to in the 2013 Agreement.

The remaining questions, then, are regarding the amounts owed and under which agreement. There is a genuine issue of material fact as to whether DM Excavating assented to the 2017 Agreement. If there was no assent, there remains a question as to whether the proper notice was given to enforce the 2017 Agreement contribution rates under the 2013 Agreement that this Court finds is still in effect. When requesting to "divert a wage increase," the Union was required

23

to give DM Excavating "at least sixty (60) days prior notice" pursuant to the Agreements. (ECF No. 20-1 at 18). Accordingly, neither party is entitled to summary judgment in its favor.

## IV.    CONCLUSION

For the reasons stated above, DM Excavating's motion for extension of time to file the cross-motion for summary judgment and to consolidate it with its response to Plaintiffs' motion for summary judgment (ECF No. 16) is **GRANTED** and Plaintiffs' motion to strike (ECF No. 24) is **DENIED**. Further, Plaintiffs' Motion for Summary Judgment (ECF No. 15) and DM Excavating's Cross-Motion for Summary Judgment (ECF No. 17) are **DENIED**. A trial order will issue under separate cover.

**IT IS SO ORDERED.**

**ALGENON L. MARBLEY**
**UNITED STATES DISTRICT JUDGE**

**DATED:  August 1, 2025**